*199 OPINION OF THE COURT
Jo Ann Friia, J.
"You shall not make any cuttings in your flesh on account of the dead or tattoo any marks upon you”. (Leviticus 19:28.)
It may be done for decoration, as an indication of status, used as a rite of passage, or as a means of obtaining magical protection against sickness or misfortune; tattoos date to ancient history. Tattooing is the practice or art of making permanent marks or designs on the body by the introduction of pigment through ruptures in the skin. Tattooing has been practiced in most parts of the world throughout history and has had its popularity in modern times. (Encyclopedia Britannica [15th ed], Micropedia, at 841.) The word tattoo comes from the Tahitian "tatú” and was rediscovered by Europeans when the age of exploration brought them into contact with American Indians and Polynesians, as recorded by James Cook’s expedition in 1769. Although there are several methods of tattooing, the tattoo artist today uses electric needles which jab the skin 2,000 to 3,000 times per minute. The needle itself does not actually hold ink, rather it spreads and pushes the ink into the skin. A tattoo can take up to a week or more to heal, but lasts forever, lying under the epidermis or outermost layer of the skin. Tattooing has been implicated in such disorders as skin cancer, and in 1961 the practice was sharply restricted in New York City because of the role of contaminated tattooing equipment in spreading hepatitis. (See, NY City Health Code [24 RCNY] § 181.15, which prohibits tattooing except for medical purposes by one licensed to practice medicine or osteopathy.)
Nevertheless, the nautical, patriotic, political, romantic, sentimental, floral, devilish, whimsical and even religious motifs crafted on human skin are as popular today with rock stars as with professionals. According to Tattoo Magazine, college students take a seat in the tattoo chair more than ever before, with 40% of all tattoos going to women. Recent newspaper articles have noted this current "craze” among the young and the efforts underway in many States to adopt laws restricting or regulating tattooing with stiff penalties ranging from large fines to jail time. (See, New York Times, Oct. 6, 1996, section 13, at 1, 5; Wall Street Journal, Sept. 16, 1996, at Bl, col 6; at B7, col 3; Gannett Suburban Newspapers, Feb. 18, 1996, section E, at 1-2.)
Penal Law § 260.21 (2) (§ 260.20 [former (3)]) makes it a class B misdemeanor to tattoo a child under the age of 18; and Penal *200 Law § 15.20 imposes strict criminal liability. Neither section of the Penal Law makes provision for civil damages and research indicates no reported case law on the subject.
The Case
This action was tried before the court without a jury. Plaintiffs are father and son who sue defendant, a local tattoo artist, for civil damages arising from the tattooing of plaintiff son when he was 17 years old. The facts not in dispute are: plaintiff son went to the home/office of defendant in the City of White Plains on September 2, 1994 for the purpose of getting a tattoo on his right forearm. The defendant did tattoo plaintiff son’s right forearm with a "yin-yang” symbol on September 2, 1994. Plaintiff son was 17 years old on September 2, 1994. Two young women accompanied plaintiff son to defendant’s office and were also tattooed by defendant on September 2, 1994. The disputed testimony and limited documentary evidence addressed the issue of proof of age. One of the two young women who accompanied the son on September 2, 1994 testified. She stated that although she was only 16 years old at the time she received her tattoo, a black rose on her left breast, she lied to defendant about her age because she knew that "the law required that I be 18”. The young woman also testified that the defendant did not ask her for identification or proof of age, but did have her fill out "a paper” where she gave her correct name, but wrong age, address and phone number.
Plaintiff son testified that he lied to defendant about his age because he knew that you had to be 18 in New York to get a tattoo. Although plaintiff son denied that he gave defendant any identification when defendant asked him for proof of age, he testified that he has had a false ID from age 14 in the form of a "working card” and that he "might have” produced it on September 2, 1994. Plaintiff son testified further that in hindsight, he would not have gotten the tattoo if he knew that it would be painful, would bleed a lot, and would have so hurt and disappointed his parents, especially his father. Plaintiff son alleged that the tattoo "embarrasses him” since it now subjects him to the comments of others when he wears a short-sleeved shirt. On cross-examination, plaintiff son admitted that he did not tell his parents that he was going to get a tattoo on September 2, 1994, and that his parents found out about it only when they found blood on his shirt. Plaintiff testified that the incident caused a serious rift in his otherwise good relationship with his father which has taken a very long time to *201 repair. He also testified that he never told his parents that he wants to have the tattoo surgically removed, and that his parents never insisted that he remove it. Plaintiff father testified largely about the adverse effect of the tattoo incident on his relationship with his son. Plaintiff father described how furious he was and how betrayed he felt that his son got a tattoo and described the tattoo as "horrible looking”. Plaintiff father testified that each time he looks at the tattoo, he is reminded of the betrayal by his son.
The defendant testified and confirmed that he is a licensed tattooist in New York and works out of his home in the City of White Plains for the last 15 plus years. He is known to those interested as "Doc Adler or Doc Philips” and holds himself out to the public as a tattoo artist. Defendant testified of his familiarity with the Penal Law and his practice of interviewing people who seek a tattoo. He stated that he is careful when dealing with minors, and has never knowingly tattooed anyone under age 18. Defendant testified that he begins by telling people over the telephone that they must be over the age of 18 before he makes an appointment with them, and requires each party to sign a standard release form before he does the tattoo. Over the objection of plaintiff’s counsel, defendant submitted copies of the release forms prepared and allegedly signed by plaintiff son and the young ladies on September 2, 1994. Defendant also testified that he secured identification from each of the young people, and obtained a work or employee ID card from plaintiff for a "Larry P. Burns” indicating that he was over the age of 18. Defendant further stated that he particularly remembered Mr. Burns because when he came in for the tattoo he at first requested "Marvin the Martian” and then the "Tasmanian Devil”, both of which were discouraged by the defendant as too elaborate for a first tattoo and too costly. Defendant confirmed that young Mr. Burns selected the "yin-yang” symbol — about the size of a silver dollar — on his right forearm, and was pleased with the results after the tattoo was completed. Defendant recalled that it took him between 30 and 40 minutes to do the tattoo and that the plaintiff did not complain of any pain. The defendant had not heard from young Mr. Burns since the date of that tattoo and his only contact was this litigation which came as a surprise to him.
Plaintiff son seeks damages for the removal of the permanent scar or mark left by the tattoo and "pain, embarrassment, discomfort, stress and mental anguish” caused by getting the tattoo when he was at the tender age of 17. Plaintiff *202 father sues for alleged damages caused by the tattoo to his relationship with his son and his own "embarrassment, mental anguish, and stress” resulting therefrom. Plaintiffs assert that the strict criminal liability imposed under the Penal Law must give rise to a private right of action for civil damages. Plaintiffs argue that defendant’s actions in tattooing a minor is negligence per se and they are entitled to resulting damages. It is noted that no criminal charges are (or were) brought against defendant in this matter.
The Issue and Holding
This is a case of first impression. The issue is whether absent statutory authority imposing civil liability for the criminal tattooing of a minor under New York’s Penal Law, a private right of action for damages exists in favor of the minor and/or his guardian? The court here finds that it does not.
There is no statutory authority or reported case regarding the civil liability of a tattooist who violates section 260.21 (2) (§ 260.20 [former (3)]) and section 15.20 of the Penal Law. By comparison and as a parallel, the court looks to the case law which addresses the criminal and civil liability of one who sells or causes to be given or sold alcohol to a minor in violation of Penal Law § 260.20 (2) (§ 260.20 [former (4)]) and General Obligations Law §§ 11-100 and 11-101 (the Dram Shop Act). The significant harm from the adverse effects of the sale/ distribution of alcohol to minors has been considered by our State Legislature and the courts as an issue of sufficient gravity to impose strict liability in appropriate cases. (Montgomery v Orr, 130 Misc 2d 807 [Sup Ct, Oneida County 1986]; Sherman v Robinson, 80 NY2d 483 [1992]; Sheehy v Big Flats Community Day, 73 NY2d 629 [1989].)
In Sheehy (supra), the Court of Appeals addressed the specific issue of whether a private right of action for damages exists under Penal Law § 260.20 (former [4]) when read with General Obligations Law §§ 11-100 and 11-101. The plaintiff in that case was a minor, age 17, who was injured as a result of her consumption of alcohol served to her by defendant in violation of the criminal statute. Although denied by plaintiff, there was evidence that she provided false identification of her age to the defendant with the intent of purchasing alcohol for her intoxication. The Court held that a violation of Penal Law § 260.20 (former [4]) does not give rise to an implied private right of action in favor of a person who has been injured as a result of his or her own consumption of alcohol. (Sheehy v Big Flats *203 Community Day, 73 NY2d 629, 631-632, supra.) Whether a private right of action exists (existed?) for breach of the criminal statute was determined by applying the three-pronged test outlined in Burns Jackson Miller Summit & Spitzer v Lindner (59 NY2d 314 [1983]) and CPC Intl. v McKesson Corp. (70 NY2d 268 [1987]). That is: (1) whether the plaintiff is one of the class for whose particular benefits the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; (3) whether creation of such a right would be consistent with the legislative scheme. (Sheehy v Big Flats Community Day, supra, at 633-634.) It was the third prong of the test that led the Court in both CPC Inti, and Sheehy to a rejection of a private right of action.
In the case at bar, applying the three-pronged test enunciated with particular attention to the third prong, this court can find no rationale for allowing a private right of action to plaintiffs. The "legislative scheme” here is Penal Law § 260.21 (2) (§ 260.20 [former (3)]) and § 15.20 (3), and by way of limited application — 20 NY Jur 2d, Constitutional Law, § 231 — Public Health Law" § 228 and General Business Law § 404, as further defined in 19 NYCRR 160.27 (statutes relating to the licensing of those engaged in the appearance enhancement businesses with specific regard to tattooing and disinfecting obligations). It is noteworthy that neither the City of White Plains nor the County of Westchester has a similar statute to that of New York City Health Code (24 RCNY) § 181.15. Thus, the message is a limited one, and this court can find no basis to permit a private right of action for civil damages that would further the legislative purpose or intent of prohibiting the tattooing of minors under the age of 18. Similarly, the court cannot agree that to impose civil penalties for a violation of Penal Law § 260.21 (2) would work as a deterrent to those tattooists who may intentionally or carelessly violate the criminal statute.
Furthermore, as in Sheehy (supra) and Sherman (supra), this court will not reward an individual who voluntarily got a tattoo by holding himself or herself out as being of legal age. In addition, there is no common-law cause of action against a tattooist in favor of a person who claims injury from the voluntary scarring of his/her body with a tattoo. Indeed, the defendant’s standard release form serves as a waiver or release from any individual seeking to recover damages sustained from the tattooing.
Accordingly, defendant’s motion to dismiss for failure to state a cause of action is granted and the complaint is *204 dismissed. All other motions upon which the court reserved decision during the trial are denied.
With respect to defendant’s counterclaim for costs and disbursements, including counsel fees pursuant to CPLR 8303-a, same is dismissed for failure of proof.